## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### Newport News Division

| | |
|---|---|
| **REGINA PATTON**, on behalf of herself and all others similarly situated, | Case No.  4:23-cv-13 |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **NEWPORT NEWS SHIPBUILDING EMPLOYEES' CREDIT UNION, INC. d/b/a BAYPORT CREDIT UNION**, | |
| Defendant. | |

Plaintiff Regina Patton, by counsel, and for her Class Action Complaint against Defendant Newport News Shipbuilding Employees' Credit Union, Inc. d/b/a BayPort Credit Union, alleges as follows:

### INTRODUCTION

1.      Plaintiff brings this action individually and on behalf of all similarly situated consumers against Defendant Newport News Shipbuilding Employees' Credit Union, Inc. d/b/a BayPort Credit Union ("BayPort CU") arising from its routine practices of (a) assessing an overdraft fee ("OD Fee") on transactions that did not actually overdraw checking accounts; and (b) for its unfair and unconscionable assessment of two out-of-network ATM fees ("OON Fees") on out-of-network ATM withdrawals preceded by a balance inquiry.

2.      BayPort CU's customers have been injured by the Bank's improper practices to the tune of millions of dollars bilked from their accounts in violation BayPort CU's clear contractual commitments.

3.      Plaintiff, on behalf of herself and three Classes of similarly situated consumers, seeks to end BayPort CU's abusive and predatory practices and force it to refund all of these improper charges.

1

Plaintiff asserts a claim for breach of contract, including breach of the covenant of good faith and fair dealing, and seeks damages, restitution, and injunctive relief, as set forth more fully below.

## PARTIES

4.      Plaintiff is a citizen and resident of Suffolk, Virginia.

5.      Defendant BayPort CU is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative Classes. BayPort CU has its headquarters in Newport News, Virginia and operates banking branches throughout Virginia.

## JURISDICTION AND VENUE

6.       This Court has original jurisdiction of this action, among other reasons, under 28 U.S.C. § 1331 (raising a federal question) and under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. §§ 1332(d)(2) and (6), this Court has original jurisdiction because (1) the proposed Class is comprised of at least 100 members; (2) at least one member of the proposed class resides outside of Virginia; and (3) the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because BayPort CU is subject to personal jurisdiction here and regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

**I.      BAYPORT CU CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT**

8.      Plaintiff has a checking account with BayPort CU.

9.      BayPort CU issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals, and other electronic debit transactions.

10.    Pursuant to its Account Documents, BayPort CU charges fees for transactions that purportedly result in an overdraft.

11.    Plaintiff brings this cause of action challenging BayPort CU's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

12.    Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, BayPort CU immediately reduces accountholders' checking accounts by the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. Therefore, customers' accounts will always have sufficient available funds to cover these transactions because BayPort CU has already sequestered these funds for payment.

13.    However, BayPort CU still assesses crippling OD Fees on many of these transactions and mispresents its practices in its Account Documents.

14.    Despite putting aside sufficient available funds for debit card and other POS transactions at the time those transactions are authorized, BayPort CU later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

15.    BayPort CU maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, BayPort CU sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

16.    That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

17.    Still, despite keeping those held funds off-limits for other transactions, BayPort CU improperly charges OD Fees on those APPSN Transactions, even though the APPSN Transactions ***always*** have sufficient available funds to be covered.

18.    Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

4

19.     There is no justification for these practices, other than to maximize BayPort CU's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But BayPort CU is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But BayPort CU was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

20.     Besides being unfair and unjust, these practices breach contract promises made in BayPort CU's adhesion contracts—contracts which fail to inform accountholders about the true nature of BayPort CU's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

21.     In plain, clear, and simple language, the Account Documents covering OD Fees promise that BayPort CU will only charge OD Fees on transactions that have insufficient funds to cover that transaction.

22.     In short, BayPort CU is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

### A.     Mechanics of a Debit Card Transaction

23.     A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from BayPort CU. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to BayPort CU, which verifies that the customer's account is valid and that sufficient available funds exist to cover the transaction amount.

24.     At this step, if the transaction is approved, BayPort CU immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction but does not yet transfer the funds to the merchant.

25.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

26.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

27.     BayPort CU (like all banks and credit unions) decides whether to "pay" debit card transactions at authorization. After that, BayPort CU is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when BayPort CU may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

28.     There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

**B.    BayPort CU's Account Contract**

29.    Plaintiff has a checking account with BayPort CU, which is governed by BayPort CU's standardized Account Documents.

30.    The Account Documents indicate that BayPort CU will only pay overdrafts when an accountholder lacks sufficient funds to pay for a transaction:

> An overdrawn account will typically result in you being charged an overdraft fee or an NSF fee. Generally, an overdraft occurs when there is not enough money in your account to pay for a transaction, but we pay (or cover) the transaction anyway. An NSF transaction is slightly different. In an NSF transaction, we do not cover the transaction. Instead, the transaction is rejected and the item or requested payment is returned. In either situation, we can charge you a fee.
> **Determining your available balance** - We use the "available balance" method to determine whether your account is overdrawn, that is, whether there is enough money in your account to pay for a transaction. Importantly, your "available" balance may not be the same as your account's "actual" balance. This means an overdraft or an NSF transaction could occur regardless of your account's actual balance.
> Your account's actual balance (sometimes called the ledger balance) only includes transactions that have settled up to that point in time, that is, transactions (deposits and payments) that have posted to your account. The actual balance does not include outstanding transactions (such as checks that have not yet cleared and electronic transactions that have been authorized but which are still pending). The balance on your periodic statement is the ledger balance for your account as of the statement date.
> As the name implies, your available balance is calculated based on the money "available" in your account to make payments. In other words, the available balance takes transactions that have been authorized, but not yet settled, and subtracts them from the actual balance. In addition, when calculating your available balance, any "holds" placed on deposits that have not yet cleared are also subtracted from the actual balance.
> …
> Overdrafts - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying, or not paying, discretionary overdrafts on your account without notice to you.

Ex. A at 4.

31.    The Overdraft Disclosures also indicate that BayPort CU will only pay overdrafts when an accountholder lacks sufficient funds to pay for a transaction:

7

An overdraft occurs when you do not have enough money in your account using the "available balance" method (as explained in the terms and conditions of your account) to cover a transaction, but we pay it anyway. We can cover your overdrafts in two different ways:

1. We have standard overdraft practices that come with your account.
2. We also offer overdraft protection plans, such as linking your account to your BayPort savings account or FlexLine (line of credit), which may be less expensive than our standard overdraft practices. Contact us to learn more about these options.

This notice explains our standard overdraft practices.

**What are the <u>standard overdraft practices</u> that come with my account?**

We do authorize and pay overdrafts for the following types of transactions:
- Checks and other transactions made using your checking account number
- Automatic bill payments

We <u>do not</u> authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
- ATM transactions
- Everyday debit card transactions

We pay overdrafts at our discretion, which means we <u>do not guarantee</u> that we will always authorize and pay any type of transaction.

If we <u>do not</u> authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if BayPort Credit Union pays my overdraft?**
Under our standard overdraft practices:
- If you have authorized BayPort Credit Union to pay an overdraft for ATM and everyday debit card transactions, we will charge you the following fees each time we pay an overdraft on ATM and everyday debit card transactions:

| Transaction Amount | Fee |
| --- | --- |
| Less than $10.00 | $5.00 |
| $10.00 to $25.00 | $20.00 |
| Over $25.00 | $29.00 |

Ex. B, p. 1.

32.    For APPSN Transactions, which are immediately deducted from a positive account balance and should be held aside for payment of that same transaction, there are always funds to cover those transactions—yet BayPort CU assesses OD Fees on them anyway.

33.    The above promises mean that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions.

34.    APPSN transactions are always initiated at a time when there are sufficient available funds in the account.

35.    In fact, BayPort CU actually authorizes transactions on positive funds, claims to set those funds aside on hold, but then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

36.    The above representations and contractual promises are untrue. In fact, BayPort CU charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that BayPort CU may impose OD Fees on any APPSN Transactions.

37.    First, and most fundamentally, BayPort CU charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that BayPort CU will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

38.    BayPort CU assesses OD Fees on APPSN Transactions that **_do_** have sufficient funds available to cover them throughout their lifecycle.

39.    BayPort CU's practice of charging OD Fees even when sufficient available funds exist to cover a transaction violates a contractual promise not to do so. This discrepancy between BayPort CU's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

40.    Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

41.     Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what BayPort CU does when it re-debits the account during a secret batch posting process.

42.     In reality, BayPort CU's actual practice is to deduct the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

43.     At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, BayPort CU cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

44.     Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, BayPort CU does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, BayPort CU releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

45.     This secret step allows BayPort CU to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which BayPort CU specifically set aside money to pay them.

46.     This discrepancy between BayPort CU's actual practices and the contract causes accountholders to incur more OD Fees than they should.

47.     In sum, there is a huge gap between BayPort CU's practices as described in the Account Documents and BayPort CU's practices in reality.

C.     *BayPort CU Abuses Contractual Discretion*

48.     BayPort CU's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous Account Documents. In addition, BayPort CU exploits contractual

discretion to the detriment of accountholders when it uses these policies, in violation of duties of good faith and fair dealing.

49.    BayPort CU uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

50.    BayPort CU uses this contractual discretion unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

**D.    *Reasonable Accountholders Understand Debit Card/POS Transactions Are Debited Immediately***

51.    The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate deduction and holding of funds for debit card/POS transactions. That is because, if funds are immediately debited from the balance and held, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited from the available balance, then they are necessarily available to be applied to the debit card transactions for which they are debited.

52.    BayPort CU was and is aware that this is precisely how accountholders reasonably understand such transactions to work.

53.    BayPort CU knows that many accountholders prefer debit cards for this very reason. Research indicates that accountholders prefer debit cards as a budgeting device because they do not allow debt like credit cards do, and because the money comes directly out of a checking account.

54.    Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that

a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, Consumer Action (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited June 4, 2021).

55.     Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, Consumer Action, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited June 4, 2021).

56.     This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States increased by approximately 1.4 million in a recent five year period and, with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest Purchases,* MarketWatch, Mar. 23, 2016,     http://www.marketwatch.com/story/morepeople-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

57.     Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

58.     BayPort CU was aware of accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

### E.     Plaintiff's Experience

59.     As an example, June 28, 2022, Plaintiff was assessed OD Fees for debit card transactions that settled that day, despite the fact that positive funds were deducted immediately, prior to that day, for

the transaction on which Plaintiff was assessed the OD Fee. At the time that the positive funds were deducted, Plaintiff had a positive balance, which would not have caused an OD Fee.

## II.   ATM CLAIM: THREE FEES FOR CASH WITHDRAWALS UNDERTAKEN WITH A BALANCE INQUIRY

60.     A BayPort CU accountholder who unsuspectingly checks the account balance as part of a cash withdrawal transaction at an out of network ATM machine can expect to pay the following fees: 1) the customer will pay the ATM operator and/or ATM network a surcharge for the <u>withdrawal</u>; 2) the customer also pays BayPort CU an OON Fee for making an <u>out of network cash withdrawal</u>; 3) and the customer will also pay BayPort CU another OON Fee for supposedly undertaking one or more balance inquiries during the cash withdrawal. A single $20.00 withdrawal can generate between $4.00 and $6.00 in fees, including two separate fees to BayPort CU.

61.     Because the provision of balance inquiries are essentially cost-free to ATM owners, and because they are hugely profitable, ATM owners have placed a great emphasis in recent years on increasing the number of supposed balance inquiries undertaken at their machines—by any means necessary.

62.     In the last decade, the revolution of mobile banking applications and increasing legislative scrutiny on the punitive nature of independent ATM machine withdrawal surcharges has forced the ATM operators to seek other sources of revenue. The 2015 Independent ATM deployer survey sponsored by Kahuna ATM Solutions and the ATM Industry Association found that declining interchange rates were one of the top concerns for Independent ATM operators.[1]  For example, one of the largest ATM operators repeatedly voiced this concern in its financial disclosures, stating:

> In addition to the impact of the net interchange rate decrease, we saw certain financial institutions migrate their volume away from some networks to take advantage of the lower

---

[1] *See* 2015 IAD Poll at https://www.atmmarketplace.com/news/2015-iad-poll-reveals-growing-attention-on-emv-shrinking-focus-on-mobile/ (Last Viewed June 11, 2020).

pricing offered by other networks, resulting in lower net interchange rates per transaction to us. If financial institutions move to take further advantage of lower interchange rates, or if networks reduce the interchange rates they currently pay to ATM deployers or increase their network fees, our future revenues and gross profits could be negatively impacted.

*See* Cardtronics plc SEC Form 10-Q, filed May 3, 2018, p. 46 (available at https://www.sec.gov/Archives/edgar/data/1671013/000155837018003893/catm-20180331x10q.htm).

63.     Feeling the financial pressure of declining interchange rates, the ATM operators sought to increase revenue in other ways.

64.     They turned to balance inquiries to drive revenue. But they had a problem: very few consumers seek them out and are willing to pay for them.

65.     Consumers, in short, use ATMs for the service of withdrawing cash, not to perform balance inquiries and transfers that are now commonly performed online or on mobile devices for free.

66.     ATM operators and financial institutions have known for years that the vast majority of customers who come to use their ATM machines are there to perform **only** a cash withdrawal.

67.     This makes perfect sense.  Due to the availability of cost-free alternatives, like checking a balance on a mobile app, phone banking, or online access, paying for a balance inquiry at an ATM is not a rational act for the vast majority of consumers.  Moreover, the shelf-life of the information obtained through a balance inquiry is extremely short.  With checking accounts having numerous transactions that post throughout the day, as well as scheduled withdrawals that occur overnight, the viability of the information received through a balance inquiry at an ATM is only even arguably beneficial for the immediate business at hand, *i.e. the cash withdrawal*.

68.     Moreover, because consumers are entitled to receive, as part of their cash withdrawal, a printed receipt at the conclusion of their transaction, they already have free access to their account balances without having to engage in a separate balance inquiry.

69.     Therefore, when a consumer uses an ATM for a balance inquiry, it is almost always *in conjunction* with a cash withdrawal transaction.

70.     For all these reasons, historically only a tiny percentage of ATM transactions were for balance inquiries.  Very few consumers need this information urgently enough to pay for it.

71.     But ATM operators had a solution: lure consumers into balance inquiries via trickery and deception in order to increase balance inquiries from those customers who otherwise do not need them or would not be willing to pay for them as part of a cash withdrawal. The ATM operators have embraced a number of tactics to increase the number of balance inquiries supposedly performed at their ATM machines.

72.     When consumers use ATMs not owned by their own financial institution, federal law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

73.     That message appears only after a user has decided to perform a cash withdrawal and entered the amount of cash she would like to withdraw.

74.     Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at out of network ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal.  But there is no warning whatsoever at an ATM that any form of balance inquiry could be an event worthy of a fee, either from the ATM owner or from the consumer's financial institution.

75.     Without such a notice, a balance inquiry appears to be nothing more than an unremarkable, free lead-in to a cash withdrawal to reasonable, diligent consumers.

76.     Second, many ATM operators use intentionally deceptive on-screen prompts to exploit and add to the consumer confusion resulting from a lack of an on-screen fee notice.  While varying in certain ways, the intention and effect is the same: to trick consumers into repeatedly paying more for a

single ATM usage by increasing purported balance inquiries.

### A.    *Overview of Claim*

77.    BayPort CU's Account Documents misrepresent to accountholders the true nature of BayPort CU's assessment of these fees.  BayPort CU's contract terms mislead accountholders to believe that a balance inquiry is not a separate, individual transaction; rather, accountholders are led to believe that a balance inquiry is part of a single transaction, such as a deposit or withdrawal, conducted almost simultaneously at a single out of network ATM.

78.    BayPort CU's uniform practice of charging two OON Fees per cash withdrawal preceded by a balance inquiry on top of the fee charged by the out-of-network ATM operator violates representations in BayPort CU's account documents, and constitutes a breach of contract and breach of the covenant of good faith and fair dealing. Indeed, BayPort CU's account documents misrepresent the possibility of being charged two fees by BayPort CU during one transaction at an out of network ATM. The practice also violates Virginia consumer protection laws.

79.    Consumers simply do not know they can be assessed *three discrete fees for a simple out of network ATM session that lasts less than two minutes.*  BayPort CU, along with the ATM owners, is all too happy to keep consumers in the dark.

80.    BayPort CU's account documents do not represent that consumers will be subject to  the triple OON Fees for an out-of-network ATM withdrawal preceded by what they deem to be a consented-for "balance inquiry."

81.    When consumers use ATMs not owned by their own financial institution, federal law requires the owners of those Out-of-Network ATMs to inform users of the amount of the usage fees charged by the ATM owner.

82.    Thus, it is standard at ATMs in the United States that when a consumer uses an ATM not owned by the consumer's home financial institution, a message is displayed on the screen stating that

usage of the ATM will cost a specified amount to proceed with a withdrawal of funds, and that such a fee is in addition to a fee that may be assessed by a consumer's financial institution for use of the ATM.

83.    Through repeated exposure to such fee warning messages, consumers are accustomed to being warned of fee assessments at out of network ATMs, and to being provided with the opportunity to decide whether the fees charged are reasonable—before proceeding with their cash withdrawal.

84.    BayPort CU knows that consumers expect a fair fee disclosure at the ATM as well as a warning and an opportunity to cancel actions before being assessed a fee, but has exploited consumers' reasonable expectation that they will only engage in fee-worthy actions knowingly and with appropriate disclosures.  BayPort CU does this by assessing additional OON Fees on consumers merely because they pressed buttons during a cash withdrawal transaction that BayPort CU, in its discretion, deems to be tantamount to requests for balance inquiries.

85.    Repeated exposure to such messages is partly responsible for building the reasonable consumer understanding that a balance inquiry is a common lead-in to a withdrawal, a mere first step to the real business at hand, and an informational exercise offered by the ATM to help inform the cash withdrawal.

86.    Reasonable consumers like the Plaintiff do not, in sum, understand a balance inquiry to be an independent transaction worthy of a separate fee.

87.    BayPort CU knows this—that in the absence of a prominent warning otherwise, consumers expect a balance inquiry to be an integral, included part of a cash withdrawal.

88.    BayPort CU has designed a scheme to assess OON Fees on those purported balance inquiries.  BayPort CU preys on the common sense that a balance inquiry preceded by a cash withdrawal is not an independent and separate transaction and therefore should not form the basis for a separate fee.

89.    If a financial institution is going to charge such a conscience-shocking fee, its contract with its members must allow for fully and fairly disclose such a fee.  BayPort CU did the opposite—

17

providing express and implied indications that balance inquiries undertaken in conjunction with cash withdrawals would <u>not</u> incur additional OON Fees. Alternatively, this practice constitutes a breach of the covenant of good faith and fair dealing.

**B.**    ***Account Disclosures***

90.    Against the backdrop of the reasonable consumer expectations and federal law above, BayPort CU's disclosures reinforce the reasonable understanding that BayPort CU will not assess a fee for a balance inquiry—especially if ATM users are not warned beforehand. The Account Documents state:

> When you use an automated teller machine not owned by us, you may be charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer).

Ex. A, p. 19.

91.    BayPort CU's disclosures also reinforce the common sense presumption that there can be no balance inquiry fee charged by BayPort CU when such an inquiry is in conjunction with a cash withdrawal at the same ATM.

92.    BayPort CU's Account Documents provide misleading disclosures as to the number of fees an accountholder will be charged for an out-of-network withdrawal preceded by a balance inquiry.

93.    Based on Account Documents, ATM users would have no reason to believe that a balance inquiry undertaken with a cash withdrawal will result in two separate OON Fees charged by BayPort CU because it is all a single episode of usage.

94.    Accountholders using non-BayPort CU ATMs are never warned that they will receive **two separate fees** from BayPort CU—plus another one from the ATM owner—when they check their balance before proceeding with a cash withdrawal at the same ATM.  But that is exactly what happens.

95.    The most reasonable understanding of this disclosure is that for all activities incident to a cash withdrawal, including a balance inquiry undertaken simultaneously, a single fee will be assessed.

96.     When a balance inquiry precedes a withdrawal, common sense and consumer expectation dictate that that two-step process is part of the same ATM use.

97.     In general, and in Plaintiff's case here, the ATM owner does not warn the user that there is a separate charge for a balance inquiry, and in fact the ATM owner does not charge a separate fee to the user for a balance inquiry. Therefore, the user can have no reasonable expectation that BayPort CU will assess a fee for an action that the ATM owner does not charge or warn about.

98.     BayPort CU accountholders using a non-BayPort CU ATM are never warned that they will receive two separate fees from BayPort CU—plus another one from the ATM owner—when they check their balance before proceeding with a cash withdrawal at the same ATM.

99.     At the very least, BayPort CU uses contractual discretion in bad faith when it assesses two OON Fees during the same ATM use when a balance inquiry immediately precedes a cash withdrawal.

**C.**     *Plaintiff's Out of Network ATM Balance Inquiry Transactions*

100.     On June 17, 2022, Plaintiff placed her BayPort CU debit card into an out of network ATM in order to make a cash withdrawal during which time she made a balance inquiry.  Following her transactions, BayPort CU issued account statements showing she was assessed, in addition to the cash withdrawal surcharge paid to the ATM operator, a separate fee from BayPort CU for making an out-of-network balance inquiry, and an additional fee from BayPort CU for making an out-of-network cash withdrawal.

## CLASS ACTION ALLEGATIONS

101.     Plaintiff brings this action on behalf of herself, and all others similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

102.     The proposed classes are defined as:

All BayPort CU checking account holders in the United States who, during the applicable

statute of limitations, were charged OD Fees on transactions that were authorized into a positive available balance (the "APPSN Class").

All BayPort CU checking account holders in the United States who, during the applicable statute of limitations, were assessed two or more OON Fees when they performed a balance inquiry prior to withdrawing cash at an out-of-network ATM (the "Balance Inquiry Class").

The classes are collectively referred to as the "Classes."

103.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes before the Court determines whether certification is appropriate.

104.    Excluded from the Classes are BayPort CU, its parents, subsidiaries, affiliates, officers and directors, any entity in which BayPort CU has a controlling interest, all customers who make a timely election to be excluded, governmental entities, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

105.    The members of the Classes are so numerous that joinder is impractical.  The Classes consist of thousands of members, the identity of whom is within the knowledge of and can be ascertained only by resort to BayPort CU's records.

106.    The claims of Plaintiff are typical of the claims of the Classes in that she, like all Class members, was charged improper OON Fees and OD Fees. Plaintiff, like all Class members, has been damaged by BayPort CU's misconduct in that she paid improper OON Fees and OD Fees.  Furthermore, the factual basis of BayPort CU's misconduct is common to all Class members, and represents a common thread of unfair and unconscionable conduct resulting in injury to all members of the Classes.

107.    There are numerous questions of law and fact common to the Classes and those common questions predominate over any questions affecting only individual Class members.

108.    Among the questions of law and fact common to the Classes are whether BayPort CU:

    a.    Charged OD Fees on transactions when those transactions did not overdraw accounts;

b.     Charged two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM;

c.     Breached its contract with consumers by the above conduct;

d.     Breached the covenant of good faith and fair dealing by the above conduct;

e.     Damaged Plaintiff and the Classes by BayPort CU's conduct and if so, the proper measure of damages.

109.    Plaintiff is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Plaintiff is an adequate representative and will fairly and adequately protect the interests of the Classes.

110.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual Class member's claim is small relative to the complexity of the litigation, and due to the financial resources of BayPort CU, no Class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Class members will continue to suffer losses and BayPort CU's misconduct will proceed without remedy.  Moreover, given that the improper fees were assessed in a uniform manner, common issues predominate over any questions, to the extent there are any, affecting only individual members.

111.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation would significantly increase the delay and expense to all parties and to the Court.  Individualized litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a class action presents far fewer management difficulties, allows claims to be heard which might otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

**FIRST CLAIM FOR RELIEF**
**Breach of Contract and Breach of the Covenant of Good Faith and Fair Dealing**
**(On Behalf of Plaintiff and the Classes)**

112.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

113.    Plaintiff and BayPort CU have contracted for bank account deposit, checking, ATM, and debit card services. The contract did not permit BayPort CU to charge OD Fees on transactions when those transactions did not overdraw accounts, nor did it permit BayPort CU to charge two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM.

114.    Further, under the laws of Virginia, good faith is an element of every contract, including the instant Account Documents pertaining to the assessment of OD Fees and OON Fees. Whether by common law or statute, all such contracts impose upon each party a duty of good faith and fair dealing. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

115.    Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes his conduct to be justified. A failure to act in good faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of violations of good faith and fair dealing include evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

116.    BayPort CU has breached the covenant of good faith and fair dealing in its contract with customers by charging OD Fees on transactions when those transactions did not overdraw accounts and

charging two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM.

117.    BayPort CU also breached the express terms of its contract by charging OD Fees on transactions when those transactions did not overdraw accounts and charging two or more OON Fees when customers performed a balance inquiry prior to withdrawing cash at an out-of-network ATM.

118.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the contract.

119.    Plaintiff and members of the Classes have sustained damages as a result of BayPort CU's breach of the contract.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF THE EFTA (REGULATION E), 12 C.F.R. § 1005, *et seq*.;**
**AUTHORITY DERIVED FROM 15 U.S.C. § 1693, *et seq*.**
**(On Behalf of Plaintiff and the APPSN Class)**

120.    The preceding allegations are incorporated by reference and re-alleged as if fully set forth herein.

121.    BayPort CU charged Plaintiff overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance.

122.    BayPort CU failed to provide Plaintiff disclosures that fully and accurately described BayPort CU's overdraft service – i.e., the service under which BayPort CU would assess overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance. Specifically, prior to enrolling Plaintiff in the service and charging Plaintiffs overdraft fees as a result of ATM and non-recurring debit card transactions authorized into a positive balance, BayPort CU failed to provide Plaintiff a segregated, non-misleading and truthful description of its practices, as part of the overdraft service, in assessing overdraft fees as a result of one-time debit card transactions, as required by 12 C.F.R. § 1005.17.

123.    Plaintiff was assessed overdraft fees as a result of debit card transactions being authorized into a positive balance, without her informed, affirmative and written consent, in violation of Regulation E (12 C.F.R. §§1005 et seq.), whose "primary objective" is "the protection of consumers" (§1005.l(b)) and which "carries out the purposes of the [Electronic Fund Transfer Act 15 U.S.C. §§1693 et seq.), the "EFTA"] (§1005. l(b)), whose express "primary objective" is also "the provision of individual consumer rights" (15 U.S.C. §1693(b)).

124.    Due to BayPort CU's violation of Regulation E (12 C.F.R. § 1005.17), Plaintiff and all members of the APPSN Classes are entitled to, and do seek, actual and statutory damages, as well as attorneys' fees and costs of suit pursuant to 15 U.S.C.A. § 1693m.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and members of the Classes demand a jury trial on all claims so triable and judgment as follows:

A.    An order certifying that this action may be maintained as a class action, that Plaintiff be appointed Class Representative and that Plaintiff's counsel be appointed Class Counsel;

B.    Declaring BayPort CU's OD and OON Fee policies and practices to be wrongful, unfair, and unconscionable;

C.    Ordering BayPort CU to immediately cease the wrongful conduct set forth above and enjoining BayPort CU from conducting business via the unlawful and unfair business acts and practices complained of herein;

D.    Restitution of all wrongful OD and OON Fees paid to BayPort CU by Plaintiff and members of the Classes as a result of the wrongs alleged herein in an amount to be determined at trial;

E.    Actual and exemplary damages in an amount to be determined at trial;

F.    Pre-judgment interest at the maximum rate permitted by applicable law;

G.    Costs and disbursements assessed by Plaintiff in connection with this action, including reasonable attorneys' fees pursuant to applicable law;

H.      Granting such other relief as the Court deems just and proper.

## TRIAL BY JURY IS DEMANDED

Plaintiff respectfully demands a trial by jury on all issues so triable.

Dated:  February 8, 2023                 Respectfully submitted,

By: */s/ Devon J. Munro*
Devon J. Munro
**MUNRO BYRD PC**
120 Day Ave. SW, First Floor
Roanoke, Virginia 24016
Firm: (540) 283-9343
Direct: (540) 283-9889
Fax: (540) 328-9290
dmunro@trialsva.com

Jeffrey D. Kaliel*
**KALIELGOLD PLLC**
1100 15th Street NW, 4th Floor
Washington, D.C.  20005
(202) 350-4783
*jkaliel@kalielpllc.com*

Sophia G. Gold*
KALIELGOLD PLLC
950 Gilman Street, Suite 200
Berkeley, CA 94710
(202) 350-4783
sgold@kalielgold.com
*Co-Counsel for Plaintiff and Proposed Class*
*will seek admission *pro hac vice*